**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA**

---------------------------------------------------------------

GLORIA ARTHUR, on behalf of herself and all
others similarly situated

                    Plaintiffs,

v.

THE STANDARD FIRE INSURANCE COMPANY
and; THE TRAVELERS INDEMNITY COMPANY

                    Defendants.

---------------------------------------------------------------

CIVIL ACTION

Case No. _____

JURY TRIAL REQUESTED

CLASS ACTION

**COMPLAINT**

1.     Gloria Arthur, on behalf of herself and all other similarly situated individuals, commercial entities and organizations (collectively, "Plaintiffs"), by and through the undersigned counsel, aver as follows:

**INTRODUCTION**

2.     Gloria Arthur has instituted this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and a class of insurance policyholders ("Policyholders"), as defined more specifically in Paragraph 11, who sustained loss or damage arising out of damage, destruction, or harm to property in the State of Louisiana as a result of

1

3.     Hurricanes Katrina and/or Rita, and who, at the time of the loss or damage, had in effect a policy of insurance from The Standard Fire Insurance Company or any other insurance company doing business in Louisiana that is a direct or indirect subsidiary of The Travelers Companies, Inc. (collectively, "Travelers").

4.     Plaintiffs bring this class action for declaratory judgment, breach of contract, breach of the implied duty of fair dealing and good faith, breach of fiduciary duty and breach of Louisiana's bad faith insurance statutes and to enforce the laws of this state, including but not limited to the Louisiana Monopolies Act, and to redress the wrongs committed by Travelers against this state and its citizens, arising out of the wrongful, negligent, reckless and/or intentional refusal of Travelers to provide insurance coverage to Policyholders for loss or damage caused by Hurricanes Katrina and/or Rita, as required by the policies of insurance Travelers issued to the Policyholders ("Travelers Policies"). This action seeks compensatory and punitive damages from Travelers as a result of its wrongful conduct, forfeiture of illegal profits, treble damages, injunctive relief, in addition to declaratory relief by the Court.

## PARTIES

5.     Plaintiff Gloria Arthur, a Louisiana taxpayer, is a person of the full age of majority with the legal capacity to sue, and at all relevant times, was domiciled, in the City of New Orleans, Louisiana. Ms. Arthur purchased a Travelers Policy. On or about August 29, 2005 and continuing until on or about September 24, 2005, Ms. Arthur had in full force and effect said Travelers Policy.

6.     Defendant The Standard Fire Insurance Company is a foreign insurer organized and existing under the laws of the State of Connecticut and doing business in the State of Louisiana and can be served through its registered agent for service of process, the Louisiana Secretary of State, 8549 United Plaza Blvd., Baton Rouge, LA 70809. Under Louisiana law, The Standard Fire Insurance Company had a duty to perform under its policies in good faith and a duty to adjust all claims under those insurance contracts in good faith.

7.      Defendant The Travelers Indemnity Company is a foreign insurer organized and existing under the laws of the State of Connecticut and doing business in the State of Louisiana and can be served through its registered agent for service of process, the Louisiana Secretary of State, 8549 United Plaza Blvd., Baton Rouge, LA 70809.  The Travelers Indemnity Company employs the adjustors who process claims against The Standard Fire Insurance Company and other Travelers entities.  Plaintiff is informed and believes that The Travelers Indemnity Company handles claims the same way for all Travelers entities doing business in Louisiana.

8.      Upon information and belief, Plaintiffs allege that Travelers adopts practices with respect to the handling of claims such that all companies that are part of Travelers doing business in Louisiana apply the same policies, practices, and procedures to the processing of claims.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, Pub. L. 109-2, because the proposed class contains more than 100 members, the aggregate amount in controversy exceeds five million dollars and at least one member of that class is diverse from Travelers.

10.     This Court has personal jurisdiction over Travelers because Travelers is or was transacting business in this District within the relevant time periods by selling and issuing policies to individuals and businesses covering immovable property located in this District. Within the jurisdiction of this Court, Travelers violated various statutes and regulations of the State of Louisiana.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this District and Travelers regularly transacts business in this District.

## APPROPRIATENESS OF CLASS ACTION

12.     Plaintiff Gloria Arthur seeks to represent a class.  The class, for purposes of relief sought by this action, is defined as:

All persons, including but not limited to their assignees, subrogees, and lienholders (including the State of Louisiana), who sustained any loss or damage of any kind, arising in any way out of damage, destruction, or harm to property in the State of Louisiana related in any way to Hurricanes Katrina and/or Rita, and who, at the time of the loss, had any rights under a policy of insurance from Travelers. Loss or damage includes but is not limited to: (1) loss or damage to real or personal property; (2) the incurring of additional living or business expenses; or (3) the loss of any business or other income. The class excludes all persons, other than the State of Louisiana as plaintiff in the Road Home Litigation, who have a suit pending against Travelers as of the date of the Preliminary Approval Order related in any way to losses stemming from Hurricanes Katrina and/or Rita. The class also excludes class counsel, members of the judiciary, their administrative staff and any other personnel who may cause a member of the Louisiana bench to be unable to preside over this action. Notwithstanding the above, the class does not include the State of Louisiana as assignee of claims by non members of the class.

13.    Predominance of Common Questions of Fact and Law.    With respect to the proposed class, common questions of fact and law predominate over the questions affecting only individual class members, particularly with respect to matters of policy interpretation, application of Louisiana law to the subject policies, application of Louisiana law to Travelers' conduct, the history and significance of specific policy provisions, Travelers' policies, practices, and procedures as they apply to the class' claims, the efficient proximate cause of the inundation of the Policyholders' properties, including the fault of third parties, and the propriety of the declaratory relief sought by the class.

14.    Typicality.    Plaintiff Gloria Arthur's claims are typical of the claims of the class members in that: (a) Ms. Arthur owns or leases property within the State of Louisiana; (b) Ms. Arthur's damages and losses were caused by a covered peril on such property; (c) such damage resulted during Hurricane Katrina; (d) Ms. Arthur filed a valid claim for such loss with Travelers which denied or devalued the claim based upon policies, practices, and procedures that applied

uniformly to members of the class; (e) which conduct is subject to Louisiana law, resulting in a uniform legal analysis and classwide resolution of the issues presented in this action.

15.    Numerosity.  The members of the class are so numerous that separate joinder of each member is impracticable.  The exact number of class members is unknown to Plaintiffs but is known to Travelers.  Given the magnitude of the losses at issue, no one can seriously question whether the class is sufficiently numerous.

16.    Adequacy.  Ms. Arthur will adequately represent the interests of the class because her interests do not conflict with those of the class; Ms. Arthur's interests are coextensive with those of the class and she asserts common rights of recovery based on essentially identical fact patterns.  Ms. Arthur has retained counsel competent and experienced in complex class action litigation who will pursue this action vigorously and in an expeditious and economical manner. The interests of the class will be fairly and adequately protected by Ms. Arthur and counsel.

17.    Superiority.  Class treatment is a superior method for the fair and efficient adjudication of each class member's claim because, among other reasons, certain class members likely are unaware of the legal issues raised by this action and unaware of the misconduct upon which this action is premised, making individual litigation and vindication of those class members' contractual rights unlikely.  For those who might litigate, the expense of prosecuting individual claims would be prohibitive in light of the typical claimant's injury, the claimants' geographical dispersion, and the highly orchestrated, daunting array of legal forces harnessed by Travelers in response to this catastrophe.  By so proceeding, the claimants are more likely to receive notice of their rights and a forum in which to seek redress.  Any difficulties in the management of this class action will be greatly outweighed by the value of the class action procedure.

18.    The prosecution of separate claims by individual members of the class would create a substantial risk of inconsistent adjudications concerning individual members of the class that would in practical terms be dispositive of, or would substantially impair or impede, the ability of other class members' to protect their interests.  Additionally, the prosecution of

individual claims would bestow an organizational and logistical benefit upon Travelers, permitting it to strategically orchestrate the thousands of lawsuits and separate adjudications resulting from such litigation, while denying each class member a commensurate organizational and logistical structure and the efficiencies that class treatment would engender.

19.    Travelers has acted on grounds generally applicable to all members of the class. The geographic scope of the class militates in favor of a single proceeding with uniform application of Louisiana law to the common facts.

## FACTUAL BACKGROUND

**Hurricane Katrina Damages Policyholders' Property**

20.    At 6:10 a.m. on August 29, 2005, Hurricane Katrina made landfall near Grande Isle, Louisiana as a Category 4 hurricane, and then made a second landfall a short time later near the Louisiana-Mississippi border, the eye of the storm passed just east of the City of New Orleans at approximately 9:00 a.m. on August 29, 2005.

21.    At 8:00 a.m. on August 29, there was water on both sides of the Industrial Canal in New Orleans, and by 9 a.m. there was six to eight feet of water in the City's Lower Ninth Ward.

22.    At 2:00 p.m. on August 29, New Orleans officials publicly confirmed the reason for the water accumulating in the Lower Ninth Ward was a breach in the Industrial Canal levee wall, a breach which was reported to be two city blocks wide.

23.    Other significant breaches in the New Orleans area levee systems occurred on or after August 29, 2005 which similarly caused releases of water into the City and adjoining parishes. In all, the levees around the City and adjoining parishes failed in at least eight (8) distinct locations, including the 17th Street, London Avenue and Industrial Canals, causing harm to different sections of the City and the surrounding parishes.

24.    Ms. Arthur sustained damage to her property as a result of the catastrophic events of August 29, 2005 and the following days, said catastrophic events being precipitated by Hurricane Katrina, a category 4 storm with sustained winds of 145 miles per hour.

25.    In accordance with policy provisions, Ms. Arthur presented her claims to Travelers for compensation for damage and/or loss caused by Hurricane Katrina.

26.    In the aftermath of the storm, it was estimated that approximately 80% of Orleans Parish was under water, and that losses from the hurricane are estimated to be as high as $200 billion.

27.    Recent engineering reports have stated that vast amounts of the water that entered the City of New Orleans and the surrounding parishes came about as the result of levee failures caused by negligent design, negligent maintenance and/or inadequate materials and not by topping of the levees.

28.    Moreover, in its April 6, 2006, edition, The Times Picayune reported that Lt. Gen. Carl Strock, the Chief of the Army Corps of Engineers, told a Senate committee that the Corps neglected to consider the possibility that the levee walls atop the 17th Street Canal levee would lurch away from their footings under significant water pressure and eat away at the earthen barriers below. The levees simply failed to work the way they were supposed to work.

29.    Congressional investigators, experts, and some Army Corps of Engineers officers have also suggested that the failure of the levees might have been caused by leaks in the barriers based upon poor construction and/or maintenance of the levee.

30.    As a result, Plaintiffs aver, upon information and belief, that any damages attributable to the levee failures are the result of improper and/or negligent design, construction, maintenance of the levees by various third parties and or third party negligence.

**Hurricane Rita Damages Policyholders' Property**

31.    Hurricane Rita made landfall on September 24, 2005 near Johnson Bayou, Louisiana, as a Category 3 hurricane.

32.    At the time Hurricane Rita struck Louisiana, much of the Greater New Orleans area had been dewatered.

33.    As a result of Hurricane Rita, in addition to wind damage, thousands of residences and businesses were damaged, or prior damage was exacerbated, when water from levee failures

once again inundated portions of Orleans Parish. Specifically, thousands of properties in the Lower Ninth Ward of the City of New Orleans were once again inundated with water when the levees, levee walls, spoilbanks and/or associated structures along the Industrial Canal/Inner Harbor Navigation Canal failed again.

**The Road Home Program**

34.    As a result of the extensive, wide-spread and enormous damage caused to residences and the correlative diaspora of Louisiana citizens from their residences, the State developed and implemented The Road Home Program. The Road Home Program was developed to provide grants to assist recipients in offsetting their uninsured losses and to foster their efforts to rebuild their residences, lives and the communities within which they live.

35.    Recipients of The Road Home Program grants ("Recipients") are or were owners of immovable property with residential improvements together with personal property located there, with such property being located in the State at the time Hurricane Katrina and/or Hurricane Rita hit Louisiana.

36.    Under The Road Home Program, Recipients were permitted to apply for grants of funds to assist them in rebuilding their damaged residences. The Road Home Program also provided financial grants to purchase severely damaged homes and to provide people with the funds necessary to relocate to new homes and/or other areas. The maximum amount of funds any Recipient was eligible to receive under The Road Home Program was $150,000.00. Any Recipient desiring to receive funds under The Road Home Program had to make a written application for funds by July 31, 2007.

37.    As part of the application process, a Recipient was required to disclose the total amount of money received from any property or casualty insurer. The State then computed the total amount of funds an eligible Recipient could be awarded. Benefits were calculated based upon standardized values applied to the square footage of the damaged residence. The amount of money received from any property or casualty insurer was then deducted from the total calculated amount of funds a Recipient was eligible to receive under The Road Home Program.

8

If all other eligibility requirements were met, the net amount remaining in the form of a grant was then distributed to the Recipient through a formal process known as closing.

38.    As a prerequisite to receiving funds under The Road Home Program, the State required a Recipient to execute, as part of the closing, a document titled The Road Home Program Limited Subrogation/Assignment Agreement ("Subrogation/Assignment Agreement") in favor of the State.

39.    Pursuant to the Subrogation/Assignment Agreement, a Recipient assigned, to the extent of the grant proceeds awarded or to be awarded to the Recipient, the Recipient's claims under any policy of casualty or property damage insurance on the damaged or destroyed residence and provided the State with a right of reimbursement of all insurance proceeds received by the Recipient after execution of the Subrogation/Assignment Agreement from said casualty or property damage insurer.  Through this Agreement, the State was granted, in its sole and uncontrolled discretion, a right to intervene into any action initiated by a Recipient against that Recipient's property or casualty insurer.  The State was also granted an independent right and cause of action to assert a claim for reimbursement or repayment of The Road Home Program's grant funds against any property or casualty insurer.

40.    For example, if a Recipient had a valid policy or policies of insurance covering his or her residence for damages associated with Hurricanes Katrina and/or Rita, and if that Recipient sustained damages covered by that insurance policy or policies and if those insurance proceeds were insufficient to compensate the Recipient for the total amount of the loss sustained as a result of Hurricanes Katrina and/or Rita, that Recipient may have been eligible to receive a grant of funds under The Road Home Program to assist in making repairs or rebuilding in an amount equal to such uninsured loss, with a cap of $150,000.00.  In other words, a Recipient may have been eligible to receive a grant in a sum of money which would otherwise be covered by insurance proceeds due under terms of a property or casualty insurance policy but unpaid.  In those circumstances the State, by virtue of the assignment described above, has a right to bring a direct action against the insurer of the residence for the total amount of funds paid to the

Recipient by the State through The Road Home Program which should have been otherwise paid under the terms of the subject insurance policy or policies.

41.    Certain Recipients are Policyholders who purchased Travelers Policies that were in full force and effect on August 29, 2005 and/or September 24, 2005.

42.    As of October 12, 2009, The Road Home Program had recorded 229,417 applications. As of the same date, The Road Home Program had conducted 125,066 grant closings, and had calculated the total amount of benefits funded and to be funded as exceeding the sum of $8 billion.

**Factual Allegations Applicable to All Class Members**

43.    Each Policyholder purchased a Travelers' Policy that was in full force and effect on August 29, 2005 and/or September 24, 2005.

44.    Each Travelers' Policy covered all loss or damage from any cause unless specifically excluded by the policy.

45.    Policyholders purchased their respective Travelers Policies with the reasonable expectation that they could recover benefits arising from any and all loss or damage to their residential real property, commercial real property, personal and business property caused by hurricanes, including all damage proximately and efficiently caused by hurricane wind, and "storm surge" proximately caused by hurricane wind, as well as, where applicable, additional living expenses, business income losses, extra expense losses, dependent property losses, among others.

46.    For the purpose of obtaining such coverage, most policies were endorsed with "special hurricane deductible endorsements" that expressly created the reasonable expectation that coverage was provided for hurricane-related damages and losses.

47.    The State of Louisiana qualifies as a class member because the residences of Policyholders who are Recipients of The Road Home Program funds are or were located in the State, and paragraphs 43 through 46 above also apply to each such Policyholder/Recipient. These Policyholders/Recipients executed a subrogation or assignment agreement in favor of the

State. Insurance proceeds are due and/or owed for losses or damages sustained to any such Policyholder/Recipient's residence and/or personal property as a result of any natural or man-made occurrence associated with Hurricanes Katrina and/or Rita under such Policyholder/Recipient's Travelers Policy. The State has been granted the rights to those proceeds and is entitled to recover as repayment or reimbursement funds provided to Policyholder/Recipients in the Road Home Program.

48.    Travelers had advance knowledge of the topographic characteristics of Greater New Orleans and the fragility of the New Orleans area levee system; yet, Travelers did not specifically exclude from coverage damages resulting from the breaking or failure of boundaries and levees of lakes, rivers, streams, or other bodies of water.

49.    The flood maps of New Orleans used and created in connection with the NFIP are premised upon the existence of the New Orleans levee system, further demonstrating that any failure of the levee system does not constitute "flood" for the purposes of the NFIP or in the context of the policies sold in the Greater New Orleans Metropolitan Area.

50.    Travelers did not specifically exclude from coverage any water damage resulting from the covered windstorm, storm surge, or man-made a/k/a third-party fault or negligence.

51.    The Policyholders purchased their policies directly from Travelers, which sells policies directly to public or through agents authorized by it to do so.

52.    The availability through the National Flood Insurance Program of flood insurance, as well as the availability of excess flood insurance, were known to and sold by Travelers at the time they sold their respective policies to the Policyholders.

53.    Despite this knowledge, at no time prior to August 29, 2005, did Travelers advise Policyholders that—contrary to Travelers' representations—its true intent was not to cover damage or loss caused by hurricanes that might in any respect involve water damage, such that the Policyholders' class members' homes and businesses may be grossly underinsured and that Policyholders thus may or should purchase primary or excess flood coverage.

54.    Policyholders trusted and relied upon Travelers' representations that the Travelers' Policies would cover any damage caused by a hurricane so that Policyholders reasonably (and correctly) believed that their respective policies would cover any and all damages to insured property sustained during a hurricane.

55.    The amount of insurance purchased by Policyholders varied based on the estimated cost of replacing the insured's home or business—an amount estimated by Travelers or its authorized agents whose estimates Travelers ratified.

56.    Travelers placed valuations on each Policyholder's property and used such valuations for purposes of determining premiums to be charged for each policy, under Louisiana's Valued Policy Law.

57.    Each Policyholder suffered a covered loss of, or damage to, his or her covered property as a result of Hurricane Katrina and/or Hurricane Rita.

58.    Many Policyholders sustained substantial damage to their homes and businesses, rendering them a total loss. All such Policyholders are similarly situated with, and their claims are typical of, all other Policyholders, except that those who suffered total losses are entitled to liquidated damages with respect to loss of their structures—namely the full value stated on the face of their respective Travelers Policies.

59.    In processing and adjusting the Policyholders' respective claims, Travelers ignored Louisiana's long-standing efficient proximate cause doctrine and instead adopted an industry-wide approach to denying valid claims for inappropriate reasons.

60.    Travelers has improperly equated inundation which had as its efficient proximate cause windstorm and/or third-party fault or negligence with "flooding" in an effort calculated to improperly expand each Travelers' Policy's water damage exclusion and thus to deny benefits owed to the Policyholders, all in violation of the Policyholders' reasonable expectations under their policies.

61.    Travelers has improperly equated storm surge (which itself is caused by windstorm) with "flooding" in an effort calculated to improperly expand each subject policy's

water damage exclusion and to thus deny benefits owed to the Policyholders, all in violation of the Policyholders' reasonable expectations under their respective policies.

62.    In or around 2000, Insurance Services Office, Inc. ("ISO") issued All Risk homeowners policy forms for Louisiana pursuant to its "Homeowners Policy Program (2000 Edition)" that recommended that the Water Damage Exclusions be expanded to encompass losses "caused by or resulting from human or animal forces or any act of nature" because the language found in the prior ISO All Risk policy forms had been interpreted to exclude only water damage occurring from natural sources.

63.    In fact, ISO explained to the Louisiana Department of Insurance: "To point out that coverage is excluded not only for naturally occurring events, we added language to these exclusions to indicate that they apply even if the excluded event is caused by or results from human or animal forces."

64.    ISO scheduled the amendments to the Water Damage Exclusion, among language amending other policy provisions, to be approved on a state-by-state basis.

65.    In March 2004, ISO, acting on behalf of all of its participating insurance companies, submitted the new language to the Louisiana Department of Insurance, and it was approved effective August 13, 2004—more than a year before Hurricanes Katrina and Rita struck.

66.    The inundation of the Policyholders' respective properties was not "natural;" it resulted from the fault and negligence of the U.S. Army Corps of Engineers and/or other third parties.

67.    Travelers instituted policies, customs, practices, and procedures encouraging and directing their adjusters to follow specific guidelines whereby the adjusters would search out a nearby waterline and apply it a given Policyholder's property in an effort calculated to deny benefits owed to the Policyholders, all in violation of the Policyholders' reasonable expectations under their respective policies.

68.     Travelers improperly instituted policies, customs, practices, and procedures encouraging and directing their adjusters to maximize damage purportedly caused by "flood" and to minimize damage caused by wind in an effort calculated to deny benefits owed to the Policyholders, all in violation of the Policyholders' reasonable expectations under their respective policies.

69.     Travelers improperly instituted other policies, customs, practices, and procedures encouraging and resulting in the routine devaluation of the Policyholders' respective claims, and the routine delay and denial of payment of benefits owed to the Policyholders, all in violation of the Policyholders' reasonable expectations under their respective policies.

70.     As an example of Travelers' improper policies, customs, practices and procedures, Travelers failed to include general contractor overhead and profit in "actual cash value of the damage" or upfront payment to Policyholders whose repairs involved three or more trades, even though payment of general contractor overhead and profit costs represents the industry standard under those circumstances.

71.     As another example of Travelers' improper policies, customs, practices and procedures, Travelers failed to pay the face value stated in Policyholders' insurance policies without deduction or offset, even though Travelers used the same method to compute loss as it did to value the covered properties for purposes of determining the premiums, thereby violating Louisiana's Valued Policy Law, former La. Rev. Stat. § 22:695(A).

72.     Each Policyholder made timely payment of all premiums due under the subject policies, and each has otherwise satisfied all conditions precedent to maintenance of this action.

**Travelers Fails to Advise Policyholders Regarding the Availability of Flood Insurance**

73.     In 1956, Congress enacted the National Flood Insurance Act. The National Flood Insurance Act, as amended in 1968, is now the seminal authority for the current National Flood Insurance Program ("NFIP"). Congress created the NFIP to provide insurance coverage for property located in floodplain areas where the risk of certain natural or seasonal flooding is increased.

74.     The NFIP provides a minimum level of insurance for the peril of natural or seasonal flooding with a cap of $250,000 per property. 42 U.S.C. § 4121(a)(1).

75.     Since the inception of the NFIP, the insurance industry has been willing to sell insurance in excess of the minimal level of coverage provided by the NFIP.  Thus, the availability of additional flood insurance was known to and sold by Travelers at the time it sold the policies to Policyholders.

76.     Despite this knowledge, at no time prior to August 29, 2005 did Travelers advise Policyholders that, contrary to its representations, its true intent was not to cover damage or loss caused by hurricanes that may involve damage, in part, from water beyond the NFIP limit, and that their homes and businesses may accordingly be grossly underinsured, or that additional coverage could be purchased excess of the NFIP limit.

77.     In addition, Policyholders have not at all been advised on the availability of flood insurance under the NFIP by Travelers.

**Travelers Combined And Conspired With Others To Suppress Competition and Obtain Greater Illegal Wealth**

78.     Travelers and/or others acting on its behalf inspected Policyholders' properties and allegedly adjusted the claims for damages or losses caused by Hurricane Katrina and Hurricane Rita.  This process constituted full proof of loss under Louisiana law.

79.     Travelers, however, formed a combination for the illegal purposes of suppressing competition in the insurance and related industries, and to obtain greater illegal wealth for itself than was possible if acting individually.

80.     Travelers' combination and conspiracy operated throughout, and in all parts of, the State of Louisiana and continues to operate to manipulate commerce and to restrain trade in this State.  The acts of this combination have seriously impeded the economic growth and disaster recovery of this State and its citizens and effectuated an on-going fraud on commerce in this State.  The combination and conspiracy between and among Travelers and other insurance

companies has adversely affected competition and trade within both the construction and homeowners' insurance industries in Louisiana.

81.    In a scheme to thwart policyholder indemnity and in direct violation of their fiduciary duties, Travelers and other insurers continuously manipulated Louisiana commerce by rigging the value of policyholder claims and raiding the premiums held in trust by their companies for the benefit of policyholders to cover their losses.    Travelers coerced and intimidated its employees into compliance with the McKinsey principle.    Travelers coerced their policyholders into settling their claims of damages for less than their value by editing engineering reports, delaying payment and forcing policyholders to litigate claims to receive full value.    Travelers, and other unnamed competing insurance companies, conspired, at all material times herein, to horizontally fix and/or manipulate prices of repair services utilized in calculating the amount(s) to be paid under the terms of Louisiana insureds' insurance contracts with Travelers for covered damage to immovable property.

82.    Travelers, with the explicit approval of its management, deliberately designed a means to reduce claim payments, commonly referred to as deny, delay and defend.    Its Louisiana insureds were forced to buy property insurance (commercial or homeowners) which likely would never provide full coverage for a loss.

83.    By using the same or substantially similar damage-estimating software, Travelers and other insurers signaled their acquiescence to low-balling claim payouts.    Those insurers who failed to participate in this conspiracy were economically coerced into compliance by the competitive advantage gained in having excessive profits to leverage against their competitors.

84.    By the time Hurricanes Katrina and Rita struck Louisiana, virtually all of the property damage insurers were setting premiums and adjusting claims under this arrangement.

85.    This continuous arrangement gave Travelers an unjust advantage over Policyholders, which it took advantage of before, during and after the greatest disaster this country has ever suffered, by reaping huge profits from the misfortunes of persons whom they

pledged to protect from risk of loss. They raised insurmountable odds against Policyholders' abilities to recover.

86.    The schemes operated under cover of secrecy and were perpetrated despite the fact of numerous past law suits against insurers.

**Travelers and Other Insurers Were Advised to Undervalue Claims**

87.    Upon information and belief, Travelers and numerous other insurance companies consulted with McKinsey & Co. between 1988 and 2000.

88.    Upon information and belief, McKinsey & Co. work with these companies to alter the paradigm of the insurance industry from one in which the claims handling process was a quasi-fiduciary function to an adversarial one.

89.    Upon information and belief, this new way of conducting claims processing resulted in substantial increase in profits for those companies.

90.    Upon information and belief, one of the principal directives of McKinsey & Co. was the use of computer software to standardize and control claim payments.

91.    McKinsey & Co. initially advised insurers to stop "premium leakage" by undervaluing claims using the tactics of deny, delay, and defend. The entire combination is dedicated to preventing "premium leakage" to the detriment of the insureds. The first insurers to adopt the principles invited others to adopt them as well. Many, if not most, including upon information and belief, Travelers, agreed. Those who adopt the principles adopt a system to raid the premium claims trust that insurers are required to maintain. By undervaluing the value of the claims, insurers are free to raid the claims trust for the benefit of management and/or stockholders.

92.    Upon information and belief, one of the principal directives of McKinsey & Co. in the selection criteria for the computer software for claim adjustment was the ability to manipulate the pricing.

93.    Upon information and belief, McKinsey & Co., as agent consultants for these companies, promoted the industry-wide adoption of the Xactimate and other similar estimating

software programs with the intended goal of holding down claim payouts through horizontal price-fixing, and thus, increasing the profits of each company.

**Travelers Used the Xactimate Computer Program and Preferred Contractors to Devalue the Market Price in Order to Underpay Its Policyholders**

94.    Upon information and belief, Travelers and/or others acting on its behalf inspected Policyholders' properties and calculated/adjusted the monetary value of the damage or loss to immovable property by using Xactimate.

95.    Xactimate is an estimating software program designed for adjusting/estimating damaged property replacement cost (to which a depreciation amount is applied if actual cash value is the proper amount to be paid under the contract).

96.    Xactimate is used by the insurance claims adjuster entering in the damaged immovable property component parts (e.g. drywall or siding) and the size of the damaged property (e.g. square feet or linear feet) and the program applies a pre-determined price for that damaged item and calculates that "line item's" replacement cost.

97.    The "line item" prices purportedly include labor, materials and other necessary items for each repair (e.g. nails, caulk, etc.).

98.    Upon information and belief, claims adjusters are pressured or required by Travelers to accept the pricing database prices in the estimates, and any supplemental, they write.

99.    Upon information and belief, if the claims adjuster does not use the database price, they risk their submission being flagged by Travelers' claim examiner and "kicked back" or rejected, thus, delaying the adjuster's payment.

100.    Xactware, the corporation which produces the Xactimate program, issues over 460 regional pricing databases, purportedly containing current pricing information for approximately 10,000 "line items," quarterly (15th day of the beginning month of the quarter (January, April, July, October).

101.    Xactware purportedly determines the line item prices by surveying area contractors, surveying material costs from the area's major suppliers, and/or by receiving settled claim amounts.

102.    Although presented by Travelers and other insurance companies as an independent company providing an objective benchmark for reasonable replacement cost pricing, Xactware closely works with many insurance companies, including Travelers.  These insurers, through coordination with each other and Xactware, intentionally devalue the "market price" in order to underpay their policyholders and/or artificially deflate construction and repair costs in the affected market.

103.    Xactware's wholly owned subsidiary Xactnet is a network which acts as the conduit for Travelers to assign claims to adjusters (through the Xactimate program), and for those adjusters to, in turn, submit estimates back to Travelers for final approval.

104.    Upon information and belief, Xactnet automatically audits the submissions by the claims adjusters and "flags" any line item price changes before transmitting the submitted adjustment to Travelers.

105.    Travelers receives its own pricing database prices which are slightly different from the Xactimate standard prices, although all are below market price.

106.    A few examples are:

| ITEM | Xactimate price | (Insurer price) | (HBAGNO*) |
|------|-----------------|-----------------|-----------|
| R&R Furnace vent rain cap and storm collar, 5" | $35.29 | $34.09 | $40-55.00 |
| R&R Siding vinyl | $2.95/SF | $2.46/SF | $3-$4.25/SF |
| R&R Batt insulation - 4"- R13 | $0.98/SF | $0.85/SF | $1.15-$1.30/SF |

*HBAGNO-Home Builders Association of Greater New Orleans

107.    The line item prices used by Travelers are, upon information and belief, consistently below the lowest market price.

108.    The repair services market that was the target of the price fixing was the repair/restoration services being provided in Louisiana, immediately after Hurricanes Katrina and Rita through today.

109.    Upon information and belief, the adoption of the Xactimate program was a direct result of the collusion between and among Travelers and other insurance companies.

110.    Upon information and belief, Travelers submitted settled claim amounts to Xactimate which were knowingly manipulated to be lower than the market price.

111.    The reduction in the amount paid out thereby reduced the payout and increased the profits of Travelers, despite the losses caused by Hurricanes Katrina and Rita.

112.    An agreement, combination, or conspiracy between Travelers and other insurers existed at all material times herein, to horizontally fix the prices of repair services utilized in calculating the amount(s) to be paid under the terms of Policyholders insurance contracts with Travelers for covered damage to immovable property.  Travelers' active collusion with Xactware in using the Xactimate tainted pricelists is a co-conspiracy within the meaning of La. C.C. art. 2324.

113.    State Farm has stated "Xactware generates and issues the price lists to State Farm. However, State Farm invests time and money reviewing and modifying the Xactware Price Lists prior to using the lists to adjust claims.  Within each region, at least one Pricing Specialist contacts and/or surveys suppliers in the region for current pricing issues . . . the New Orleans price list was updated a number of times per quarter from 2005 through 2007."

114.    However, State Farm's price list LANO5F5D3, active on or about November 15, 2005, upon information and belief, was identical to Traveler's Insurance Company price list LANO2S52, active on or about November 15, 2005, with each price list containing over 10,000 line items.  This is a statistical impossibility without collusion.

115.    Upon information and belief, Travelers and other insurers submitted settled claim amounts to Xactimate which were knowingly manipulated to be lower than the market price.

116.    Upon information and belief one primary mechanism for the creation of these lower settled claims amounts was through the use of "preferred contractors."

117.    These contractors are provided a higher volume of business referrals from Travelers and other insurance companies in exchange for following their mandates.

118.    The preferred contractors, at a minimal overhead and profit margin dictated by the insurer, then complete the repair work for the insurer's Xactimate estimated cost.

119.    This allows the insurance company to justify the below market pricing it submits to Xactware for input into the settled claims amount database.

120.    Current "settled claim amounts," and their component prices, are shared by the insurance companies through a free program that comes with the Xactimate program: Xactanalysis or Xactanalysis for Service Providers (SP).

121.    Xactanalysis and Xactanalysis SP contain a function called "Industry Trend Reports." Upon information and belief, the "Industry Trend Reports" provides a mechanism for insurance companies to share the current prices being submitted by competitors, and thus, coordinate the horizontal price-fixing suppression, or attempted suppression, of the overall market in repair services at virtually every geographic level and price component.

122.    Additionally, upon information and belief, Xactanalysis SP provides the insurance company the ability to "drill down to" and monitor/compare the individual claim adjuster's payout performance, and thus, ensure compliance with the pricing levels set by the company.

123.    In Xactware's own words:

> [B]eing the clear market leader for online property claims management puts Xactware in the unique position of providing essential reports that represent pricing trends for the entire industry. We can provide these reports because of the massive amounts of claims data sent through our systems. That means you have historical trends at your fingertips for the components that most affect your claims.
>
> The Industry Trend reports will show you at-a-glance how prices have changed for key industry indicators such as lumber, drywall, and floor coverings over the past 10 quarters. You can track labor

prices for individual trades, see how any pricing area compares to the rest of the country, or even compare what a small bathroom loss costs today versus last quarter or last year.

Both Xactanalysis and Xactanalysis for Service Providers (SP) users have access to these Industry Trend reports, which are updated each quarter.   Along with publishing these reports, qualified statisticians provide insight to these trends and identify the leading reasons for any increase or decrease.

You can view Industry Trend reports for the entire country (USA or Canada) or drill down to a specific state, province or city.  Some of the reports available include: composite reports for such items as carpet, drywall, lumber and roofing; retail labor reports; average estimate value reports; and basket of goods reports.  You can also view newly added price list items and other quarterly enhancements made to our pricing database.   When you are connected to Xactanalysis, you are connected to the entire industry!

124.    The repair services market that was the target of the current price sharing was the repair/restoration services being provided in Louisiana, or alternatively in the Gulf Coast region, immediately after Hurricanes Katrina and Rita through today.

125.    Current price sharing through the "Industry Trend Reports" creates an anti-competitive means of coordinating horizontal price-fixing which is unreasonable and cannot be justified when weighed against the purported informative justification for the "trend reports" and the minimal pro-competitive impact of allowing comparison of the claims paid out versus the overall industry trend.

126.    Upon information and belief, the market repair/restoration prices in Louisiana increased 100% from pre-storm prices by December 2005, and full rebuilding prices increased by 50%.

127.    Xactimate price lists used by all insurance companies increased approximately 15-20% from pre-storm prices by December 2005.  For instance, the Xactimate price list used by Travelers for R & R drywall, hung, taped, floated ready for paint was $1.41/sq. ft. (Price list:

LANO2B41, July 21, 2005). By November-December 2005 Travelers' price list had increased to $1.69/sq ft. (LANO2S52)—an increase of 20%.

128.    Travelers acted with consciousness of other competing insurance companies' actions in using the Xactimate program, and its attendant below market prices, and intentionally acted in parallel, and in combination, to fix the prices utilized in calculating the amount to be paid under the terms of Policyholders' contracts with Travelers for covered damage to immovable property.

129.    Upon information and belief, in 1999, the CEO of Farmers Insurance Group, Marty Feinstein, made the following videotaped statement entitled "Claims Vision":

> We conducted a study of what we perceived were the top companies in the United States today that have an effective claims operation. Look at that list. It is an enviable group. [Slides showing Companies Studied: Fireman's Fund, Royal, USF&G, AMICA, Progressive, State Farm, Allstate, American Family, Safeco, USAA, Hartford.] It is great just to be among them. But we needed to understand them before we could understand ourselves. And literally, we received permission to go and visit each one of these companies. And a staff of people actually went to these companies, sat down with their claims people to understand their strategies, their technology, where they're headed . . . ."

130.    Upon information and belief, Travelers used the Xactimate program when Farmers Insurance Group was invited to understand the technology used in the claims handling process.

131.    Upon information and belief, the adoption of the Xactimate program was a direct result of the collusion between Travelers and the various property insurers listed in the above referenced video.

132.    Additionally, insurance companies have actively coordinated their actions through various organizations and associations, and regular conferences and summits, including, but not limited to: Xactware's Annual Industry Summit, Property Loss Research Bureau's (PLRB) Claims Conference & Insurance Services Expo, Regional Adjuster Conferences, and Large Loss

Conference; The Insurance Summit (only senior executives are invited); The National Underwriter Company's annual America's Claims Event: Property Insurance Report National Conference; The Property Casualty Insurers Association of America's Executive Roundtable Seminar, ACIC General Counsel Seminar, Information Technology Conference, and their Annual Meeting; The American Insurance Association; Insurance Information Institute; and Insurance Services Office, Inc. ("ISO") which until 1994 was under the direct control of a partnership of insurers and in August 2006 purchased Xactware, Inc.

133.    The purpose of the conspiracy was to depress the amount paid out under the terms of the insurance contracts to below market prices and deprive Louisiana insureds of the actual cash value and/or replacement value of the damaged property.

134.    The reduction in the amount paid out thereby reduced the payout and increased the profits of Travelers, despite the losses caused by Hurricanes Katrina and Rita.

135.    The combination has grown with rapid strides.    It threatens the welfare and liberties of consumers because it preys on policyholders at the time of their greatest need and helplessness, and leverages the incredible economic and legal power of the insurance industry. As such, it runs afoul of the Louisiana Monopolies Act.

136.    Using these tools, Travelers has combined with other insurers to accumulate vast wealth for itself by violating the indemnity principle upon which the industry was founded and by violating its fiduciary duties to its insureds. This combination has greatly impeded the ability of the entire state to recover from the devastating effects of Hurricanes Katrina and Rita.

137.    The power and control of the combination of Travelers, other insurers, McKinsey and Xactimate has interfered with and manipulated the natural flow of commerce in Louisiana, extracted monopoly rents from victims and inflicted huge economic damage to this state and its citizens. The alteration of the claims handling process implemented by this combination lowered the claims payment ratio (known as the payout to premium ratio) from a historic average of approximately seventy cents ($0.70) per premium dollar to approximately fifty cents ($0.50) per

premium dollar, allowing these insurers to suffer the worst catastrophe in history while still earning sizable profits.

138.    Pursuant to a common course of conduct, Travelers intentionally and/or negligently suppressed the value of the price lists in an effort to reduce the amount it paid to Policyholders for property damage

139.    Policyholders' damages, including having to pay out-of-pocket to meet the price for repair services and the cost associated with delaying disbursement of adequate proceeds, were caused by the failure of Travelers to pay market cost for damaged items Travelers acknowledged was due under their policies.

## COUNT I - DECLARATORY JUDGMENT

140.    Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if the same were set forth at length herein.

141.    An actual controversy exists between Plaintiffs and Travelers concerning Travelers' duty to indemnify Plaintiffs for their losses.

142.    Consequently, under the circumstances, it is necessary and appropriate for the Court to declare Plaintiffs' and Travelers' rights and duties under the Travelers' Policies pursuant to 28 U.S.C. § 2201.

143.    The losses suffered by Policyholders as a result of Hurricanes Katrina and/or Rita are covered losses under their respective Travelers' Policies.

144.    Policyholders have given timely notification to Travelers and made timely demands in writing that Travelers cover Policyholders' losses.

145.    Travelers is obligated by the terms and conditions of the Travelers' Policies to indemnify Policyholders for their losses arising from Hurricanes Katrina and/or Rita.

146.    Travelers has refused to indemnify Policyholders for their losses arising from Hurricanes Katrina and/or Rita and has denied coverage for such losses.

147.    Thus, Plaintiffs are entitled to a declaratory judgment that the damages Policyholders suffered are covered losses under the Travelers' Policies.

148.    Specifically, the Policyholders' losses and damages were caused by covered perils, the efficient causes of their losses and damages were covered perils and the efficient and proximate causes of losses and damages were covered perils.

149.    Further, to give the "flood" exclusions a broad reading and thus disallow the coverage for the damages arising from this catastrophic disaster, which occurred despite the vast and expansive levees existing in the greater New Orleans area, would contravene the very purpose of the Travelers' Policies.

150.    Travelers' interpretation of the exclusions and the anti-concurrent causation clause should be declared unenforceable on the grounds such interpretation, if enforced, will lead to absurd consequences and would be contrary to public morals, public policy, good faith, elementary fairness, and a violation of the abuse of rights doctrine, valued policy law and other Louisiana law.

151.    The reasonable expectations of the Policyholders is that "flood" encompasses overflowing of the Mississippi River, accumulation of surface water due to heavy rainfalls, or similar phenomena, but not the failing of virtually all man-made structures containing navigable waters of the United States surrounding the New Orleans Metropolitan Area due to negligent conduct beyond the policyholders' control.

152.    Finally, Policyholders should not be deprived of the coverage of the Travelers' Policies where Travelers has drafted vague, ambiguous and unclear limitations on coverage, thereby violating the rule that exclusions must be clearly and explicitly drafted.  If so intended, Travelers should have specifically excluded hurricane damage and/or the failure of levees as the most probable perils for the New Orleans Metropolitan Area.  Instead, Travelers decided to sell the same comprehensive insurance policies that they sell in the "high and dry" plains throughout the United States.

153.    While Travelers may continue to make investment income during the course of any protracted legal proceedings, Policyholders, on the other hand, have little recourse but to sit idly by awaiting a decision, all the while being unable to begin reconstruction or renovation of their homes until they have the money to pay contractors.

154.    As a result, without resolution of this issue by declaratory judgment, Policyholders, in most instances, will be unable to remedy the damages they fully expected were covered by their policies.

155.    WHEREFORE, Plaintiffs respectfully request that this Court enter a declaratory judgment in their favor and against Travelers as to Count I, ordering and decreeing that

(1)    The first efficient proximate cause of the losses and damages suffered by the Policyholders on August 29, 2005 was "windstorm," a covered peril under all of the insurance policies purchased by the Policyholders, thereby rendering any subsequent impact from water released by the levee and/or levee wall failures irrelevant to coverage afforded by the insurance policies;

(2)    The second efficient proximate cause of the losses and damages resulting from water entering the City of New Orleans and adjoining parishes on August 29, 2005 from the breaches in the levees and levee walls along the 17th Street Canal. London Avenue Canal, Industrial Canal, and elsewhere were acts of negligence, standard covered perils in Travelers' Policies;

(3)    The third efficient proximate cause of the losses resulting from water entering the City of New Orleans and adjoining parishes on August 29, 2005 was "storm surge", a known meteorological phenomenon that is not specifically excluded by any of the Travelers' Policies, thereby rendering any damage caused by "storm surge" and resulting water pressure covered under the policies;

(4)     The breaking or failure of boundaries of lakes, reservoirs, rivers, streams, or other bodies of water was a peril not specifically excluded by any of the Travelers' Policies; and

(5)     The damage caused by water entering the City of New Orleans and adjoining parishes from Hurricane Katrina beginning on August 29, 2005, due to the breaches in the levees and levee walls along the 17th Street Canal, London Avenue Canal, Industrial Canal, and elsewhere neither falls within the regular definition of "flood," nor within any of the Travelers' Policies' exclusions of "flood."

(6)     The breaking or failure of boundaries of lakes, reservoirs, rivers, streams, or other bodies of water was a peril not specifically excluded by the Travelers' Policies.

(7)     The inundation of the subject properties due to breaches in the navigable waterway system in and around New Orleans—including all associated levees, levee walls, spoilbanks, and/or associated structures—neither falls within the regular definition of "flood," nor within any of the subject insurance Travelers' Policies' exclusions of "flood."

(8)     Those Policyholders who suffered total losses to their respective properties suffered a "covered loss of, or damage to the covered property" and are entitled to recover the full value placed on their properties from Travelers without deduction or offset, as well as general contractor overhead and profit.

(9)     Travelers' "anti-concurrent causation" policy provisions are inapplicable where a covered peril is the efficient proximate cause of the loss and, therefore, all losses or damages resulting from such covered peril are covered under the policies at issue.

(10)    Travelers improperly failed to include general contractor overhead and profit in "actual cash value of the damage" or upfront payment to Policyholders whose repairs involved three or more trades.

(11)    The period of prescription for Plaintiffs' claims has been tolled by the pendency of class allegations pursuant to La. Code of Civ. Proc. art. 596; therefore, the claims are not prescribed.

## COUNT II - BREACH OF CONTRACT

156.    Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if the same were set forth at length herein.

157.    Valid contracts exist between Policyholders and Travelers in the form of the individual Travelers' Policies, which, inter alia, obligate Travelers to cover the loss of or damage to a dwelling or structure and personal and/or business property therein which is caused by wind or windstorms, storm surge, vandalism or acts of negligence, as well as additional living expenses, loss of business income, extra expense, dependent property losses, and/or other losses.

158.    Policyholders paid all premiums due under their policies and materially performed their obligations under those policies.

159.    Travelers' Policies required that the Policyholders be made whole and indemnified for the loss, subject to the stated deductible and policy limits.

160.    Upon proper and repeated demands by Policyholders, Travelers has refused to meet its obligations under the policies and refused to pay the full amount of covered losses, in breach of the terms and conditions of their policies and Louisiana law.

161.    Travelers also failed to include general contractor overhead and profit in "actual cash value of the damage" or upfront payment to Policyholders whose repairs involved three or more trades, even though payment of general contractor and overhead costs represents the industry standard under those circumstances.

162.    As a direct and proximate result of the breaches by Travelers, Policyholders were deprived of the benefit of insurance coverage for which Travelers was paid substantial premiums and, accordingly, Policyholders have suffered substantial damages.

163.    Ms. Arthur and other persons and entities that are similarly situated were damaged by Travelers' breach of contract in an amount equal to the difference between the amount paid and the amount due under the subject policy.

164.    Travelers violated former La. R. S. 22:658 by failing to initiate loss adjustment within the required time period, and failing to pay the reasonable amount due or make an offer of settlement within 30 days, despite receipt of the required proof of loss and demand.  Plaintiffs and class members show that this failure to pay was arbitrary, capricious, and/or without probable cause, which entitles Plaintiffs and class members to penalties, costs and reasonable attorney's fees.

165.    Travelers violated former La. R. S. 22:1220 by failing to pay the reasonable amount due within 60 days after satisfactory proof of loss.  Plaintiffs and class members show that this failure to pay was arbitrary, capricious and/or without probable cause, which entitles the Plaintiffs and class members to penalties in the amount of two times the damages sustained or $5,000, whichever is greater.

166.    WHEREFORE, Plaintiffs demand judgment against Travelers for all amounts due under the policies, other compensatory damages, interest, attorneys' fees, costs, and any further relief this Court deems equitable, just and proper.

### COUNT III - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

167.    Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if the same were set forth at length herein.

168.    By selling policies to Policyholders, Travelers assumed a duty of good faith and fair dealing to the Policyholders, including an obligation to promptly indemnify Policyholders for their losses.

169.   Travelers has failed to follow Louisiana's long-standing efficient proximate cause doctrine and have instead adopted an industry-wide approach to denying valid claims for inappropriate reasons.

170.   Travelers has also failed to provide coverage for Policyholders' losses and instead have attempted to equate the efficient proximate cause of windstorm and the negligent design, construction and maintenance of the levees in the New Orleans area and/or third party negligence which caused Policyholders' losses with flooding in an effort to exclude coverage.

171.   Travelers has also wrongfully denied coverage for claims by equating "storm surge" with flood, thereby improperly expanding the flood exclusion and defeating the reasonable expectation of Louisiana policyholders.

172.   Moreover, Travelers directed its adjusters to follow specific "guidelines' whereby the adjusters would arbitrarily, capriciously and without probable cause, find a nearby waterline and apply it to Policyholders' property in order to deny full payment of Policyholders' claims.

173.   Travelers further directed its adjusters to ignore all other information and evidence and, instead, to use only the procedure and guidelines mandated by them, specifically, the arbitrary application of any nearby waterline to Policyholders' property.

174.   In directing its adjusters to ignore any information or evidence other than the arbitrary and capricious application of any nearby waterline, Travelers violated La. Rev. Stat Ann. § 658.2(A)(1) which provides that "[n]o insurer shall use the floodwater mark on a covered structure without considering other evidence, when determining whether a loss is covered or not covered under a homeowners' insurance policy."

175.   Moreover, Travelers failed to include general contractor overhead and profit in "actual cash value of the damage" or upfront payment to Policyholders whose repairs involved three or more trades, even though payment of general contractor and overhead costs represents the industry standard under those circumstances.

176.   By engaging in all of the conduct above, Travelers lacks an arguable or legitimate basis for refusing to pay the Policyholders' claims.

177.    By engaging in the conduct described above, Travelers has violated the duties of good faith and fair dealing owed to Policyholders.

178.    As a direct and proximate result of Travelers' bad faith actions, Policyholders have suffered, and will continue to suffer, substantial damages.

179.    Moreover, by engaging in the conduct above, Travelers' persistent and systematic actions and failures to act were done with malice and gross negligence and with a disregard for Policyholders' rights so as to warrant the imposition of punitive damages against Travelers.

180.    WHEREFORE, Plaintiffs demand judgment against Travelers for all amounts due under the policies, other compensatory damages, punitive damages, interest, attorneys' fees, costs, and any further relief this Court deems equitable, just and proper.

### COUNT IV - BREACH OF FORMER LA. REV. STAT. ANN. §§ 22:658, 22:658.2 & 22:1220 AND LA. CIV. CODE ART. 1997 (INSURANCE BAD FAITH)

181.    Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if the same were set forth at length herein.

182.    Pursuant to former La. Rev. Stat. Ann § 22:1220(A), Travelers owes Policyholders a "duty of good faith and fair dealing" as well as a duty to "adjust claims fairly and promptly and to make a reasonable effort to settle claims" with Policyholders.

183.    Travelers' uniform denial of coverage constitutes bad faith under former La. Rev. Stat. Ann. § 22:658, 658.2, and 1220, La. Civ. Code Ann. art. 1997, and Louisiana law.

184.    Former La. Rev. Stat. Ann § 22:1220(B) prohibits Travelers from, inter alia, "[m]isrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue" and "[f]ailing to pay the amount of any claim . . . when such failure is arbitrary, capricious or without probable cause."

185.    Travelers has misrepresented the coverage afforded by the policy provisions by, among other conduct, wrongfully and without a legitimate basis seeking to have the "flood" exclusions given a broad reading and misinterpreting and misapplying other policy provisions in an effort to disallow coverage for the damages arising from Hurricane Katrina and/or Rita.

186.    Travelers has failed to follow Louisiana's long-standing efficient proximate cause doctrine and has instead adopted an industry-wide approach to denying valid claims for inappropriate reasons without probable cause.

187.    Specifically, Travelers has failed to provide coverage for Policyholders' losses and, instead, has attempted to equate the efficient cause of windstorm and the negligent design, construction and maintenance of the levees in New Orleans which cause Policyholders' losses with flooding in an effort to exclude coverage and/or third party negligence.

188.    Travelers has also wrongfully denied coverage for claims by equating "storm surge" with flood, thereby improperly expanding the flood exclusion and defeating the reasonable expectation of Louisiana's not for profit policyholders.

189.    As such, Travelers has breached known duties through a motive of self-interest and/or ill will without having a reasonable basis to deny these claims, instead denying claims in an arbitrary and capricious manner and without probable cause.

190.    Moreover, pursuant to a recent enactment of the Legislature of Louisiana, an insurance company acts in bad faith when it fails "to pay claims pursuant to RS. 22:658.2 [and] such failure is arbitrary, capricious, or without probable cause."    La. Rev. Stat. Ann. § 22:1220(A) (2005).

191.    In directing its adjusters to consider only nearby waterlines and to ignore all other evidence in determining whether Policyholders' losses are covered under the policies, Travelers violated former La. Rev. Stat. Ann § 658.2.A(1), which provides that "[n]o insurer shall use the floodwater mark on a covered structure without considering other evidence, when determining whether a loss is covered or not covered under a homeowners' insurance policy."

192.    Travelers failed to initiate loss adjustment in a timely manner on Policyholders' claims as required by former La. Rev. Stat. Ann. § 22:658.

193.    By engaging in all of the above conduct, Travelers has engaged in bad faith conduct in violation of former La. Rev. Stat. Ann. § 22:658, 658.2, and 1220, La. Civ. Code Ann. art. 1997, and Louisiana law.

194.   WHEREFORE, Plaintiffs demand judgment against Travelers for all amounts due under the policies, other compensatory damages, interest, attorneys' fees, costs, and any further relief this Court deems equitable, just and proper.

## COUNT V - HORIZONTAL PRICE FIXING

195.   Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if the same were set forth at length herein.

196.   An agreement, combination or conspiracy between Travelers and other competing companies existed at all material times herein, to fix the prices utilized in calculating the amount(s) to be paid under the terms of Policyholders' insurance contracts with Travelers for covered damage to immovable property.

197.   Travelers acted with consciousness of other competing insurance companies' actions in using the Xactimate program, and its attendant below market prices, and intentionally acted in parallel, and in combination, to fix the prices utilized in calculating the amount to be paid under the terms of Policyholders' and class members' insurance contracts with Travelers for covered damage to immovable property.

198.   The reduction in the amount paid out thereby reduced the payout and increased the profits of Travelers, despite the losses caused by Hurricanes Katrina and Rita.

199.   Setting the payout amount lower than it would be if market prices were paid out would be detrimental to Travelers' competitiveness if it were not for the combined use of the same prices.   Additionally, Travelers actively coordinated their actions through various organizations and associations.

200.   Travelers and its competitors and partners in ISO set up Xactimate as an ostensible "independent" and "objective" benchmark for reasonable replacement cost pricing, on which it can rely for the payment of proceeds due under the policy.  In truth, however, Travelers, through ISO and Xactware, intentionally, and in combination with other insurers, devalue the "market price" in order to underpay their policyholders and/or artificially deflate construction and repair costs in the affected market. Plaintiffs further show that:

A.    In the traditional price-fixing case, the defendants colluded to set a price for fairly identical goods or services. The purchasers are forced to pay too much for that goods or service. Here, the collusion is to decrease the value of the goods or service. But the effect is the same: The purchaser pays too much for the goods or service (i.e. the coverage afforded under the policy). While, in the short term, minimizing the pay-out on a claim would seem to be in the insurers' interest, from a competitive point of view, it is not in the insurers' long-term competitive interest, because people will not purchase or renew policies if they can get more goods or services (i.e. coverage) for the same money from someone else.

B.    In addition, and in the alternative, Travelers and the other insurers are effectively the "purchasers" of replacement, repair, and/or construction goods and services, attempting to artificially set the market too low.

C.    While it could be argued that insurers only "compete" for premium dollars at the time a policy is initially purchased, Travelers and other insurance companies have admitted that there is competition on the claims / pay-out end as well, by taking the position in legal proceedings that Claims Manuals and other claims-handling policies are proprietary trade secrets which must be protected by court order, to prevent competitive injury.

D.    Xactware is, upon information and belief, a wholly-owned subsidiary of ISO, which is, upon information and belief, owned by and/or otherwise comprised of, the major insurance companies, including Travelers and its primary competitors. Through ISO and/or Xactware, and/or otherwise, Travelers and its competitors benefit freely from short-term profits and savings, (in violation of their contractual and legal duties to policyholders), without the risk of suffering a competitive disadvantage, secure in the knowledge that their competitors are doing the same.

E.    As outlined herein, there are both direct and circumstantial evidence of not only a combination, but also a combination that is anti-competitive in terms of its effects and injuries. Just a few examples include: the admission by a Farmers' executive in 1999 that he was provided with, and utilized, his competitors' strategies and technologies; the advertisements by Xactimate that it "connects you to the entire industry"; the statement by an ISO executive that, in light of the "intensifying competition", those insurers who do not 'keep up in the intellectual and technological arms race' face a "grim prognosis"; the acknowledgment by James Greer of the Association of Property-Casualty Claims Professionals that the insurers "behaved as one" towards their policyholders following Hurricanes Rita and Katrina.

201.    Travelers' intentional collusion in suppressing the payments to Louisiana insureds for damages caused to their property from Hurricanes Katrina and Rita violates La. Rev. Stat. 51:121, et seq.

202.    The payment of actual cash value, replacement value, and/or market value within the State of Louisiana is "commerce" within the meaning of La. Rev. Stat. 51:121.

203.    Travelers' intentional acts to depress the payments of the actual cash value, replacement value, and/or market value through the use of Xactimate's tainted price lists is a conspiracy within the meaning of La. Rev. Stat. 51:122(A) and/or La. Civ. Code art. 2324(A).

204.    Travelers' intentional acts to depress the payments of the actual cash value, replacement value, and/or market value through the use of Xactimate's tainted price lists substantially lessens competition within the meaning of La. Rev. Stat. 51:124(A).

205.    Plaintiffs' damages were caused by the failure of Travelers to pay actual cash value, replacement cost, and/or market cost for damaged items Travelers acknowledged was due under their policies.

206.    WHEREFORE, Plaintiffs demand judgment against Travelers for all amounts due under the policies, other compensatory damages, interest, attorney's fees, costs, and any further relief this Court deems equitable, just and proper.

## COUNT VI - INTENTIONAL MISREPRESENTATION/FRAUD

207.    Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if the same were set forth at length herein.

208.    At all material times, Travelers intentionally colluded with Xactware to keep down the prices of its price lists in the Xactimate system.  In particular, upon information and belief, Travelers knowingly provided lower altered prices as well as other pricing data to Xactware for use in the Xactimate program.

209.    At all material times, Travelers was able to perpetuate the fraud with Xactware by basing price lists, in whole or in part, on settled claim amounts submitted by Travelers and/or its agents.

210.    At all material times, Travelers knew many policyholders would rely upon the payment provided by Travelers and not seek any additional supplemental payment.

211.    At all material times, Travelers' misconduct was intentional.

212.    WHEREFORE, Plaintiffs demand judgment against Travelers for all amounts due under the policies, other compensatory damages, interest, attorneys' fees, costs, and any further relief this Court deems equitable, just and proper.

## COUNT VII - BREACH OF FIDUCIARY DUTY

213.    Policyholders repeat and reallege the allegations of the foregoing paragraphs as if the same were set forth at length herein.

214.    In selling and placing insurance, as described above, Travelers functions as an insurance broker or agent.

215.    As such, Travelers owes its respective Policyholders a fiduciary duty of undivided loyalty, due care, and fidelity.

216.    Travelers owed Policyholders a fiduciary duty to perform their responsibilities as insurance brokers and/or agents with good faith and appropriate skill in Policyholders' best interests and with heightened care, fidelity, diligence and full disclosure required of a fiduciary.

217.    Among other things, insurance brokers and/or agents are obligated to provide advice and assistance to prospective insureds so that risks to which they are exposed are adequately insured, or at a minimum, to provide them with adequate opportunity and advice to make a decision as to what coverage to purchase.

218.    Travelers' failure to fully disclose and properly advise the Policyholders, as described above, breached the fiduciary duties owed to the Policyholders.

219.    Such breaches caused the Policyholders' substantial damages and losses.

220.    WHEREFORE, Plaintiffs demand judgment against Travelers for all amounts due under the policies, other compensatory damages, interest, attorney's fees, costs, and any further relief this Court deems equitable, just and proper.

## COUNT VIII - PRICE-FIXING ANTI-TRUST VIOLATION

221.    Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if the same were set forth at length herein.

222.    Travelers' intentional collusion in suppressing payments to Louisiana insureds for damages caused to their property over many years, including, but not limited to, property damaged by Hurricanes Katrina and Rita, violates La. Rev. Stat. 51:121, et seq.116.

223.    The payment of actual cash value, replacement value, and/or market value for repair services within the State of Louisiana is commerce within the meaning of La. Rev. Stat. 51:121.

224.    Travelers' intentional acts to depress the payments of the actual cash value, replacement value, and/or market value through the use of Xactimate is a conspiracy within the meaning of La. Rev. Stat. 51:122(A).

225.    Travelers' intentional acts to depress the payments of the actual cash value, replacement value, and/or, market value through the use of estimation programs substantially

lessens competition within the meaning of La. Rev. Stat. 51:122. In particular, Travelers, by, through and with their partners and co-conspirators, ISO, McKinsey, and Xactware, set up Xactimate as an ostensible "independent" and "objective" benchmark for reasonable replacement cost pricing, which they can rely on for the payment of proceeds due under the policy. In truth, however, Travelers, through Xactimate, intentionally devalues the "market price" in order to underpay its policyholders and/or artificially deflate construction and repair costs in the affected market. Plaintiffs further show that:

A.    Travelers directly negotiates with and provides for the payment of contractors and others, and, in such regard, is effectively the purchaser of replacement, repair, and/or construction goods and services, and is attempting to, and succeeding in, artificially setting the market for such goods and services too low.

B.    In the alternative, and to the extent that Travelers is considered the seller of insurance coverage: In the traditional price-fixing case, the defendants collude to set a price for fairly identical goods or services. The purchasers are forced to pay too much for that goods or service. Here, the collusion is to decrease the value of the goods or service. But the effect is the same: The purchaser pays too much for the goods or service (i.e. the coverage afforded under the policy). While, in the short term, minimizing the payout on a claim would seem to be in the insurers' interest, from a competitive point of view, it is not in the insurers' interest, because people won't purchase or renew policies if they can get more goods or services (i.e. coverage) for their money somewhere else.

C.    While it could be argued that insurers only "compete" for premium dollars at the time a policy is initially purchased, the insurers have admitted that there is competition on the claims / pay-out end as well, by taking the position in legal proceedings that claims manuals and other policies are proprietary trade secrets which must be protected by court order, to prevent competitive injury.

D.    Additionally, Travelers and other insurers actively coordinated their actions through various companies, organizations and associations.

226.    Plaintiffs were substantially injured, both financially and emotionally, by having to pay their own monies and repair costs that should have been paid by their insurers and/or the delays in rebuilding/repairing and/or the necessary litigation in securing the amounts owed under the contracts with defendant insurers.

227.    Under applicable law, insurers are held to the indemnity and fiduciary duty standards, both of which Travelers breached.

228.    WHEREFORE, Plaintiffs demand disgorgement of illegal profits, treble damages and injunctive relief, and any further relief that may be recovered at law or in equity.

### COUNT IX - BREACH OF FORMER LA. REV. STAT. ANN. § 22:695(A)
### (VALUED POLICY LAW)

229.    Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if the same were set forth at length herein.

230.    Pursuant to former La. Rev. Stat. Ann § 22:695(A), "if the insurer places a valuation upon the covered property and uses such valuation for purposes of determining the premium to be made under the policy, in the case of total loss the insurer shall compute and indemnify or compensate any covered loss of, or damage to, such property which occurs during the term of the policy at such valuation without deduction or offset, unless a different method is to be used in the computation of loss, in which latter case, the policy, and any application therefore, shall set forth in type of equal size, the actual method of such loss computation by the insurer."

231.    As a result of Hurricanes Katrina and Rita, Policyholders sustained substantial damage to their homes, rendering them total losses.

232.    Travelers placed a valuation upon the covered immovable property owned by Policyholders.

233.    Travelers used such valuation for purposes of determining the premium charges to be made under the policy covering Policyholders' immovable property.

234.    Travelers did not use a different method in the computation of the loss of the covered immovable property owned by Policyholders.

235.    The policies, and any application therefore, issued by Travelers to Policyholders did not set forth in type of equal size a different method which was actually used in the loss computation.

236.    Travelers failed to indemnify and compensate Policyholders at the valuation used for purposes of determining the premium, without deduction or offset, as required by former La. Rev. Stat. Ann. § 22:695(A).

237.    Travelers' failure to indemnify and compensate Policyholders at the valuation used for purposes of determining the premium, without deduction or offset, constitutes a violation of former La. Rev. Stat. Ann. § 22:695(A).

238.    WHEREFORE, Plaintiffs demand judgment against Travelers for all amounts due under the policies, other compensatory damages, interest, attorneys' fees, costs, and any further relief this Court deems equitable, just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury to determine all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and the class members (all those persons similarly situated) sought to be represented, pray that:

A.    Summons be issued to Travelers to appear and timely give an answer;

B.    After a hearing on the issues, the Court certify the proposed plaintiff class, naming the Plaintiffs and any others deemed by the Court to be appropriate, as class representatives for all the unnamed members of the class;

Case 2:09-cv-07332-CJB-JCW   Document 1   Filed 11/13/2009   Page 42 of 43

C.     After a hearing on the issues, the Court appoint the undersigned attorneys to serve as counsel for the class;

D.     After due delays and legal proceedings, judgment be rendered in favor of the Plaintiffs and the class and against the defendants for all damages asserted and proved, including, but not limited to, treble damages, reasonable attorneys' fees, and costs;

E.     Injunctive relief;

F.     The defendants be charged with paying the Plaintiffs and the class the full amount of legal interest on all sums deemed to be owed to the Plaintiffs and the class from the date of judicial demand until satisfaction of judgment, all assessable costs of this litigation, including expert fees, costs, and expenses, reasonable attorneys' fees, and penalties, all to the extent permitted by law; and

G.     The defendants be charged with paying the Plaintiffs and the class for all other legal and equitable relief to which the Plaintiffs and the class are entitled, as determined by this Court to be just and proper.

Respectfully submitted this _13th__ day of _November_, 2009.

PLAINTIFFS' LAW FIRMS

By: ___/s/ Calvin C. Fayard, Jr.____
Calvin C. Fayard, Jr. La. Bar Roll #5486
Wanda J. Edwards, La. Bar Roll #27448
**FAYARD AND HONEYCUTT, APLC**
519 Florida Avenue, SW
Denham Springs, LA 70726
Phone: (225) 664-4193
Facsimile: (225) 664-6925
Email: calvinfayard@fayardlaw.com
Email: wandaedwards@fayardlaw.com

AND

Joseph M. Bruno, La. Bar Roll #3604
**THE LAW OFFICE OF**
**JOSEPH M. BRUNO APLC**

42

855 Baronne Street
New Orleans, LA 70113
Phone: (504) 561-6776
Email: jbruno@jbrunolaw.com

AND

Frank C. Dudenhefer, Jr., La. Bar Roll #5117
**THE DUDENHEFER LAW FIRM, LLC**
601 Poydras Street, Suite 2655
New Orleans, LA 70130
Phone: 504-525-2553
Facsimile: 504-523-2508
Email: FCDLaw@aol.com

AND

N. Frank Elliot III, La. Bar Roll #23054
**N. FRANK ELLIOT III, L.L.C**
**(As a member of Ranier, Gayle & Elliot, LLC)**
Post Office Box 3065
Lake Charles, LA 70602
Phone: 337-309-6999
Facsimile: 337-439-2545
Email: frank@nfelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2009, I electronically filed the forgoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record in the captioned matter.

/s/ Calvin C. Fayard, Jr.
CALVIN C. FAYARD, JR.